**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| Rainforest Connection, | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 4:25-cv-02735 |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| Bourhan Yassin, Chrissy Durkin, Mahreen | § | |
| Qazi, and Molly Webster | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANT BOURHAN YASSIN'S ANSWER, AFFIRMATIVE DEFENSES,
COUNTERCLAIM, AND THIRD-PARTY CLAIM TO
PLAINTIFF'S ORIGINAL COMPLAINT**

Defendant Bourhan Yassin ("Yassin" or "Defendant") files this Original Answer,
Affirmative Defenses, Counterclaim, and Third-Party Claim to Plaintiff Rainforest Connection's
("RFCx") Original Complaint ("Complaint") and would respectfully show the Court as follows:

**<u>INTRODUCTION</u>**

Plaintiff's Complaint constitutes a desperate attempt to rewrite history and deflect from its
own catastrophic governance failures. This lawsuit is part of a malicious vendetta orchestrated by
RFCx's founder Christopher "Topher" White ("White") to defame and malign Yassin and the other
defendants. For his part, White corrupted RFCx's entire data archive of over 100 million audio
files while attempting to take them for personal benefit; siphoned $375,000 in RFCx's funds; lived
for years on the non-profit's dime; and then systematically sabotaged RFCx to cover his tracks.
After White was removed as CEO in 2022 due to years of toxic mismanagement, self-dealing,
erratic behavior, and misconduct that nearly destroyed the organization, Yassin worked tirelessly
with others to rebuild RFCx, preserve its assets, and safeguard the interests of its many
stakeholders. In retaliation, White—who retained his board position—launched a vindictive

17317944

campaign to regain control, ultimately causing the resignation of over 30 of 34 employees and the near collapse of the organization. Every financial transaction Plaintiff now purports to challenge was authorized by White when he was CEO and/or on RFCx's board of directors.  This lawsuit is nothing more than White's final attempt to destroy the man who exposed his own failings and shortcomings.

## THE PARTIES

1.    Defendant admits the allegations in Paragraph 1 of the Complaint.

2.    Defendant admits he is an individual who resides in Texas at 7503 Woolgrass Crescent Way, Katy, Texas 77493.

3.    Defendant is without knowledge or information sufficient to admit or deny the allegations in Paragraph 3 of the Complaint.

4.    Defendant is without knowledge or information sufficient to admit or deny the allegations in Paragraph 4 of the Complaint.

5.    Defendant is without knowledge or information sufficient to admit or deny the allegations in Paragraph 5 of the Complaint.

## JURISDICTION AND VENUE

6.    The allegations in Paragraph 6 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, Yassin denies that this Court has subject matter jurisdiction over claims brought by an entity that, upon information and belief, lacks capacity to sue due to its delinquent charitable registration status in California and failure to maintain corporate formalities.[1]  Yassin denies any remaining allegations in Paragraph 6.

---

[1] **Exhibit A**, 2025 Delinquency Notice, California Attorney General.

17317944

7.      Yassin admits he resides in this District. The remaining allegations in Paragraph 7 contain legal conclusions to which no response is required. To the extent a response is required, Yassin denies these allegations.

8.      The allegations in Paragraph 8 of the Complaint contain legal conclusions to which no response is required.  To the extent a response is required, Defendant does not challenge venue at this time.  Yassin denies any remaining allegations in Paragraph 8.

## FACTUAL BACKGROUND

9.      Yassin admits that RFCx was founded as a nonprofit in 2013 to combat environment degradation.  Yassin denies any remaining allegations in Paragraph 9 of the Complaint.

10.     Yassin admits that RFCx has a Board of Directors.  Yassin denies any remaining allegations in Paragraph 10 of the Complaint.

11.     Yassin admits that White founded RFCx and served as CEO from 2013 until early 2022.  Yassin denies any remaining allegations in Paragraph 11 of the Complaint.

12.     Yassin admits he was hired by RFCx in March 2017 as Chief Operating Officer and promoted to CEO in January 2022.  Yassin denies any remaining allegations in Paragraph 12.

13.     Yassin denies the allegations in Paragraph 13.

14.     Yassin admits that Chrissy Durkin ("Durkin") served as Vice President of Growth and Expansion at RFCx until her resignation on or about March 12, 2024.  Yassin denies any remaining allegations in Paragraph 14.

15.     Yassin admits that Durkin was a co-founder of Wildmon Inc. ("Wildmon"), but denies any remaining allegations in Paragraph 15.

17317944

16.     Yassin admits that Mahreen Qazi served as Vice President of Strategy and Operations at RFCx until her resignation on or about July 5, 2024.  Yassin denies any remaining allegations in Paragraph 16.

17.     Yassin lacks sufficient knowledge or information to confirm or deny the allegations contained in Paragraph 17.

18.     Yassin admits that Molly Webster served as Director of Marketing at RFCx until on or about July 5, 2024.  Yassin denies any remaining allegations in Paragraph 18.

<b>Embezzlement</b>

19.     Yassin denies the allegations in Paragraph 19.

20.     Yassin admits he implemented NetSuite and closed QuickBooks as part of professionalizing RFCx's accounting.  Yassin denies any remaining allegations in Paragraph 20.

21.     Yassin denies the allegations in Paragraph 21.

22.     Yassin denies the allegations in Paragraph 22.

23.     Yassin denies the allegations in Paragraph 23.

24.     Yassin denies the allegations in Paragraph 24.

25.     Yassin denies the allegations in Paragraph 25.

26.     Yassin denies the allegations in Paragraph 26.

27.     Yassin denies the allegations in Paragraph 27.

28.     Yassin denies the allegations in Paragraph 28.

29.     Yassin denies the allegations in Paragraph 29.

30.     Yassin denies the allegations in Paragraph 30.

31.     Yassin denies the allegations in Paragraph 31.

17317944

**Arbimon Inc.'s Founding**

32.    Yassin denies the allegations in Paragraph 32.

33.    Yassin admits Arbimon was incorporated on or about August 9, 2022.  Yassin denies the remaining allegations in Paragraph 33.

34.    Yassin denies the allegations in Paragraph 34.

35.    Yassin denies the allegations in Paragraph 35.

36.    Yassin admits the allegations in Paragraph 36.

37.    Yassin denies the allegations in Paragraph 37.

38.    Yassin admits the allegations in Paragraph 38.

39.    Yassin denies the allegations in Paragraph 39.

40.    Yassin denies the allegations in Paragraph 40.

41.    Yassin admits a Contractor Agreement was executed.  Yassin denies the remaining allegations in Paragraph 41.

42.    Yassin admits the "Arbimon" trademark was transferred in March 2023, but denies the remaining allegations in Paragraph 42.

43.    Yassin admits engaging with Silverstrand Capital but denies the remaining allegations in Paragraph 43.

44.    Yassin lacks sufficient knowledge or information to confirm or deny the allegations contained in Paragraph 44.

45.    Yassin denies the allegations in Paragraph 45.

**Data Corruption, and Accidental Disclosure of Arbimon**

46.    Yassin admits that a data corruption issue arose but denies the remaining allegations in Paragraph 46.

47.    Yassin admits the allegations in Paragraph 47.

17317944

48.    Yassin denies the allegations in Paragraph 48.

49.    Yassin admits the allegations in Paragraph 49.

50.    Yassin denies the allegations in Paragraph 50.

51.    Yassin denies the allegations in Paragraph 51.

52.    Yassin denies the allegations in Paragraph 52.

53.    Yassin denies the allegations in Paragraph 53.

### Arbimon Inc., the Resolution

54.    Yassin denies the allegations in Paragraph 54.

55.    Yassin denies the allegations in Paragraph 55.

56.    Yassin denies the allegations in Paragraph 56.

57.    Yassin denies the allegations in Paragraph 57.

58.    Yassin denies the allegations in Paragraph 58.

### Wildmon Inc.

59.    Yassin denies the allegations in Paragraph 59.

60.    Yassin denies the allegations in Paragraph 60.

61.    Yassin denies the allegations in Paragraph 61.

62.    Yassin denies the allegations in Paragraph 62.

63.    Yassin denies the allegations in Paragraph 63.

64.    Yassin denies the allegations in Paragraph 64.

65.    Yassin denies the allegations in Paragraph 65.

66.    Yassin denies the allegations in Paragraph 66.

67.    Yassin denies the allegations in Paragraph 67.

68.    Yassin denies all allegations in Paragraph 68.

69.    Yassin denies the allegations in Paragraph 69.

17317944

70.     Yassin denies the allegations in Paragraph 70.

71.     Yassin denies the allegations in Paragraph 71.

**Deletion and Alleged Theft of RFCx's Information**

72.     Yassin denies the allegations in Paragraph 72.

73.     Yassin admits that RFCx used Google Workspace, but denies the remaining allegations in Paragraph 73.

74.     Yassin lacks sufficient knowledge or information to confirm or deny the allegations contained in Paragraph 74.

75.     Yassin denies the allegations in Paragraph 75.

76.     Yassin admits that RFCx used Monday.com, but denies the remaining allegations in Paragraph 76.

77.     Yassin lacks sufficient knowledge or information to confirm or deny the allegations contained in Paragraph 77.

78.     Yassin admits that RFCx's database runs on open source software, but denies the remaining allegations in Paragraph 78.

79.     Yassin denies the allegations in Paragraph 79.

80.     Yassin denies the allegations in Paragraph 80.

81.     Yassin denies the allegations in Paragraph 81.

82.     Yassin denies the allegations in Paragraph 82.

**Yassin's Exit, Funder Fallout and Efforts to Rebuild**

83.     Yassin admits the allegations in Paragraph 83.

84.     Yassin admits various employees resigned and moved to Wildmon.

85.     Yassin denies the allegations in Paragraph 85.

86. Yassin admits accurately informing a funder that the science team had resigned, but denies the remaining allegations in Paragraph 86.

87. Yassin admits funders became concerned after 30+ employees resigned citing Board failures, but denies the remaining allegations of Paragraph 87.

88. Yassin admits that Board member David Klein resigned on or about June 23, 2024, but denies the remaining allegations of Paragraph 88.

89. Yassin denies the allegations in Paragraph 89.

## GENERAL DENIAL

Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, Yassin denies each and every allegation contained in the Complaint that is not specifically admitted to in this Answer.

## CAUSES OF ACTION

### Count 1: Breach of Fiduciary Duty
(*Against Bourhan Yassin*)

90. Yassin incorporates all preceding responses as if fully set forth herein.

91. The allegations in Paragraph 91 constitute legal conclusions to which no response is required. To the extent a response is required, Yassin denies the allegations.

92. Yassin denies the allegations in Paragraph 92.

93. Yassin denies the allegations in Paragraph 93.

94. Yassin denies the allegations in Paragraph 94.

95. Yassin denies the allegations in Paragraph 95.

96. Yassin denies the allegations in Paragraph 96.

97. Yassin denies the allegations in Paragraph 97.

17317944

**Count 2: Computer Fraud and Abuse Act – 18 U.S.C. § 1030**
*(Against all Defendants)*

98.    Yassin incorporates all preceding responses as if fully set forth herein.

99.    The allegations in Paragraph 99 constitute legal conclusions to which no response is required. To the extent a response is required, Yassin denies these allegations.

100.    Yassin denies the allegations in Paragraph 100.

101.    Yassin denies the allegations in Paragraph 101.

102.    Yassin denies the allegations in Paragraph 102.

**Count 3: Conversion**
*(Against Bourhan Yassin)*

103.    Yassin incorporates all preceding responses as if fully set forth herein.

104.    Yassin admits RFCx owned bank accounts, but denies the remaining allegations of Paragraph 104.

105.    Yassin denies the allegations in Paragraph 105.

106.    Yassin denies the allegations in Paragraph 106.

**Count 4: Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act**
*(Against all Defendants)*

107.    Yassin incorporates all preceding responses as if fully set forth herein.

108.    The allegations in Paragraph 108 constitute legal conclusions to which no response is required. To the extent a response is required, Yassin lacks sufficient knowledge to admit or deny whether RFCx possesses trade secrets as defined by law. Yassin denies the remaining allegations in Paragraph 108.

109.    Yassin denies the allegations in Paragraph 109.

110.    Yassin denies the allegations in Paragraph 110.

## Count 5: Breach of Contract
### (*Against Bourhan Yassin*)

111.    Yassin incorporates all preceding responses as if fully set forth herein.

112.    Yassin admits executing an employment agreement dated on or about January 26, 2022. Yassin denies any remaining allegations in Paragraph 112.

113.    The allegations in Paragraph 108 constitute legal conclusions to which no response is required. To the extent a response is required, Yassin denies the allegations.

114.    Yassin denies the allegations in Paragraph 114.

115.     The allegations in Paragraph 115 constitute legal conclusions to which no response is required. To the extent a response is required, Yassin denies the allegations.

116.     The allegations in Paragraph 116 constitute legal conclusions to which no response is required. To the extent a response is required, Yassin denies the allegations.

117.    The allegations in Paragraph 117 constitute legal conclusions to which no response is required. To the extent a response is required, Yassin denies the allegations.

118.    Yassin denies the allegations in Paragraph 118.

## Count 6: Business Disparagement
### (*Against Bourhan Yassin*)

119.    Yassin incorporates all preceding responses as if fully set forth herein.

120.    Yassin denies the allegations in Paragraph 120.

121.    Yassin denies the allegations in Paragraph 121.

122.    Yassin denies the allegations in Paragraph 122.

## Count 7: Tortious Interference with Contract
### (*Against all Defendants*)

123.    Yassin incorporates all preceding responses as if fully set forth herein.

124.    Yassin denies the allegations in Paragraph 124.

125.    Yassin denies the allegations in Paragraph 125.

126.    Yassin denies the allegations in Paragraph 126.

**Count 8: Tortious Interference with Prospective Business Relationships**
*(Against all Defendants)*

127.    Yassin incorporates all preceding responses as if fully set forth herein.

128.    Yassin denies the allegations in Paragraph 128.

129.    Yassin denies the allegations in Paragraph 129.

130.    Yassin denies the allegations in Paragraph 130.

**Count 9: Conspiracy**
*(Against all Defendants)*

131.    Yassin incorporates all preceding responses as if fully set forth herein.

132.    Yassin denies the allegations in Paragraph 132.

133.    Yassin denies the allegations in Paragraph 133.

134.    Yassin denies the allegations in Paragraph 134.

## <u>AFFIRMATIVE DEFENSES</u>

Without conceding that he bears the burden of proof as to any issue, Yassin asserts the following affirmative defenses to some or all of Plaintiff's claims:

**First Affirmative Defense: Lack of Capacity to Sue**

135.    Plaintiff lacks the legal capacity to sue.  Upon information and belief, Plaintiff is not in good standing under California law, has failed to maintain proper corporate formalities, and/or lacks the requisite authority to bring this action.  Plaintiff's registration as a nonprofit corporation is delinquent in the State of California where it is based.[2]  This Court lacks subject matter jurisdiction over claims brought by an entity lacking capacity to sue.

---

[2] **Exhibit A, Notice of Delinquency.**

11

## Second Affirmative Defense: Unclean Hands

136.    Plaintiff's claims are barred by the doctrine of unclean hands due to Plaintiff's own wrongful conduct, including but not limited to: (a) White's admitted destruction of RFCx data files worth $500,000-$700,000 in damages; (b) White's siphoning of $375,000 to his company, Squibbon; (c) the Board's complete abandonment and neglect of its fiduciary and other duties; (d) White's pattern of lying to funders, partners, and RFCx board members and staff; and (e) White's erratic behavior, misconduct, and poor judgment that led to mass resignations.

## Third Affirmative Defense: Comparative/Contributory Fault

137.    Any damages allegedly suffered by Plaintiff were caused in whole or in part by Plaintiff's own actions, negligence, or wrongful conduct, including: (a) the Board's gross negligence in oversight; (b) retaining White on the Board after his removal as CEO; (c) ignoring White's admitted data destruction; and (d) failing to act on 30+ employee resignations citing Board failures.

## Fourth Affirmative Defense: Other Causation

138.    Any damages allegedly suffered by Plaintiff were caused in whole or in part by the actions, negligence, or wrongful conduct of third-parties, including White.

## Fifth Affirmative Defense: Authorization and Ratification

139.    To the extent any of Defendant's alleged conduct occurred, such conduct was authorized, ratified, or acquiesced to by Plaintiff's Board of Directors or other authorized representatives.  Specifically, then-CEO White expressly authorized or ratified the financial transactions at issue in December 2021.

17317944

### Sixth Affirmative Defense: Business Judgment Rule

140.    Defendant's actions as CEO were undertaken in good faith and in what he reasonably believed to be the best interests of RFCx, and as such, are protected by the business judgment rule.  All decisions were made to save an organization being destroyed by its founder's toxicity and sabotage and the Board's abandonment and neglect.

### Seventh Affirmative Defense: Failure to Mitigate Damages

141.    Plaintiff has failed to mitigate its alleged damages, including by: (a) failing to remove White after he admitted to corrupting RFCx's core data archive; (b) failing to pursue White for his $375,000 embezzlement to his company, Squibbon, or additional self-dealing; (c) failing to maintain proper Board oversight, even after being alerted by multiple RFCx staff members on numerous occasions; and (d) allowing White to continue sabotaging the organization from his Board position.

### Eighth Affirmative Defense: No Damages

142.    Plaintiff has suffered no damages as a proximate result of any conduct by Defendant.  All damages were caused by: (a) White's admitted data destruction; (b) White's embezzlement or other self-dealing; (c) White's toxic and erratic behavior, misconduct, and poor judgment both inside and outside the organization that led to mass resignations, partner estrangement, and reputational setbacks for RFCx; (d) the Board's complete abandonment and neglect of its fiduciary and other duties; (e) White's pattern of lying to funders, partners, and RFCx board members and staff; and (f) White's sabotage of partner relationships and the organization's goals.

17317944

**Ninth Affirmative Defense: Prior Material Breach**

143.    To the extent a valid contract existed between the parties, Plaintiff materially breached such contract prior to any alleged breach by Defendant by: (a) failing to provide promised compensation, compensation increases, and reimbursements; (b) failing to implement the required bonus structure within 90 days; (c) failing to pay agreed 20-30% annual bonuses; (d) failing to conduct required performance reviews; and (e) constructively terminating Defendant without cause, excusing Defendant's performance.

**Tenth Affirmative Defense:  Truth and/or Privilege**

144.    Truth is an absolute defense to RFCx's business disparagement claim.

## COUNTERCLAIM AND THIRD-PARTY CLAIM

Defendant/Counter-Plaintiff Bourhan Yassin brings the following claims against Counter-Defendant Rainforest Connection and Third-Party Defendant Christopher "Topher" White:

## PARTIES

145.    Counter-Plaintiff Bourhan Yassin is an individual residing in Katy, Texas.

146.    Counter-Defendant Rainforest Connection is a California nonprofit corporation. As a party to this case, RFCx may be served through its counsel of record.

147.    Upon information and belief, Counter-Defendant Topher White is an individual residing in California and is the founder and a current Board member of RFCx.  He may be served at 799 Clayton Street, San Francisco, California 94117 or wherever he may be found.

## JURISDICTION AND VENUE

148.    Subject to Yassin's Motion to Dismiss, this Court has jurisdiction over the parties and subject matter of these Counterclaims and Third-Party Claims pursuant to 28 U.S.C. § 1367.

149.    Venue is proper in this district pursuant to 28 U.S.C. § 1391.

14

17317944

## FACTUAL BACKGROUND

## Or, How White's Misconduct and the Board's Neglect Virtually Destroyed RFCx

### A.    White's Abysmal Leadership and Forced Removal (2013-2022)

150.    For nearly a decade, RFCx founder Topher White ran RFCx as his personal fiefdom, treating it as a bottomless expense account while driving it toward collapse through gross mismanagement; misrepresentations about the organization's mission and impact (leading to at least three Board members' resignations); self-dealing for private gain in several instances; and toxic and erratic behavior leading to dispirited employees and eventual mass resignations. While initially not allowed on the Board, over time, White insinuated himself into a Board seat through sustained pressure, political influence, and deft palace intrigue. [3]

151.    By late 2021, White's misconduct had become so severe that RFCx's entire management team drafted an ultimatum threatening to expose his behavior publicly unless he was removed as CEO.[4]  The letter signed by the "Employees of Rainforest Connection" demanded White's removal and documented years of misconduct that had decimated staff morale and organizational effectiveness.  Faced with imminent public exposure, White was forced to step down as CEO in January 2022, though he retained his Board position—a decision that would prove ruinous.

152.    Ultimately, White's documented misconduct included: (a) siphoning of organizational funds, including paying himself a supposed "pension" of at least $17,500 in 2022 after removal as CEO (which Yassin caught and terminated), and using RFCx money to pay for his personal San Francisco apartment, and transferring $375,000 to his personal company,

---

[3] *See* **Exhibit B**, April 4, 2018 email e-mail from then-Board Chair about White's toxic attitude.

[4] *See* **Exhibit C**, November 21, 2021 letter from RFCx Management to Board.

17317944

Squibbon, in December 2021 (which Yassin had been convinced was legitimate and approved)[5]; (b) attempting to use $500,000 in RFCx funds to purchase a personal residence in Oakland for himself; (c) toxic, bizarre, and erratic behavior that alienated partners, funders, Board members, and staff; and (d) habitually lying to (or interfering with) partners, funders, industry, and RFCx Board members and staff about organizational or operational matters, including to promote Squibbon over RFCx.[6]

**B.     Yassin's CEO Appointment & Discovery of Financial Chaos (Jan.-Jun. 2022)**

153.    Yassin reluctantly accepted the CEO position on or about January 26, 2022, only after the management team made clear they would expose White's misconduct publicly if leadership changes were not made.   Yassin inherited an organization in crisis: hidden bank accounts, falsified financial records, demoralized staff, and damaged partner relationships.

154.    Upon assuming the CEO role, Yassin discovered the extent of White's financial mismanagement: (a) multiple 'off-book' bank accounts that White had hidden from the Board; (b) no proper accounting systems or financial controls; (c) multiple undocumented reimbursement transactions, including for personal travel expenses; (d) no formal budgeting or financial planning processes; and (e) an absence of basic nonprofit governance practices.   Yassin also eventually discovered that White had manipulated internal IT systems to filter internal communications to control messaging.   White's paranoia only grew.

155.    By way of background, while COO, Yassin was consistently underpaid, sometimes only receiving a small percentage of his annual salary.   For example, between 2018 and 2021,

---

[5]   Over time, Yassin learned that White eventually spent the entire $375,000 of RFCx's funds in about a year, paying himself $6,000-$10,000 per month as Squibbon salary and even paying his girlfriend Sarah Gerber for side contracts to promote Squibbon products.

[6] *See* **Exhibit D**, April 22, 2024 Email to Board re White's visit to Tides Foundation; **Exhibit E**, April emails re Squibbon promotion.

17317944

when the agreed upon minimum salary was $170,000 per year, Yassin received far less.  One year, he only around received $35,000.  In addition, between 2018 and 2021, Yassin also covered RFCx payroll for certain employees out of his own pocket.  He also was entitled to be reimbursed for company expenses associated with travel, etc., which sometimes did not happen.  All of this was discussed with White and at least then-Board Chair Whit Missildine.  Yassin, in turn, accumulated substantial amounts of debt on behalf of RFCx.  To keep operations running, Yassin repeatedly advanced his own funds.  This pattern underscores Yassin's commitment to RFCx's mission and its stakeholders.

156.    As part of his contract to serve as CEO, RFCx promised Yassin that he would be provided annual salary increases commensurate with Yassin's performance; a bonus structure within 90 days of employment paying annual bonuses of 20-30% as agreed between Yassin and White; and receive regular performance reviews.  None of these things happened.

157.    In connection with Yassin's promotion to CEO, White also made specific promises and authorizations about compensation and reimbursement.  The payments Plaintiff now characterizes as "embezzlement" were expressly authorized by White in December 2021 as part of the CEO transition arrangement and White's quiet exit.  These included: (a) reimbursements for years of personal expenses Yassin had incurred supporting RFCx; (b) payments authorized by White as part of the leadership transition; and (c) compensation for converting Yassin's personal residence into RFCx's warehouse and operations center after the organization's warehouse lease became unaffordable.[7]  White specifically stated this was within his authority as outgoing CEO and Board member and that he would "take care of" any necessary Board approvals. Unfortunately, Yassin's trust in White was misplaced.

---

[7] *See* **Exhibit F**, Photographs Showing Yassin Residence dedicated to RFCx inventory and storage.

17317944

### C.    Yassin's Efforts to Professionalize RFCx (2022-2023)

158.    As CEO, Yassin set about professionalizing RFCx's operations by: (a) implementing proper accounting software (NetSuite) to replace White's chaotic system; (b) discovering and documenting the hidden bank accounts White had been operating; (c) creating the organization's first real budgets and financial controls, including an independent, third-party audit for fiscal year 2022; (d) establishing proper vendor relationships and contracts; and (e) building transparent reporting systems for the Board.

159.    Yassin and others learned in late 2022 and into 2024 that White was consistently blurring the lines between RFCx's nonprofit efforts and his for-profit venture Squibbon—effectively promoting his own business and products under RFCx's name for his own personal gain.[8] White even pressed RFCx to "pre-buy" $250,000 worth of Squibbon "Delta" hardware to raise cash after the $375,000 he took ran out.  Further, White was representing himself as the official face of RFCx at conferences and in the industry without consultation or coordination. And the Board did nothing to shut down such behavior.

160.    After RFCx could no longer afford its warehouse lease, Yassin's property (his vacant home pending a move) was converted to serve as RFCx's warehouse and operations center with White's express approval.[9] White personally visited and inspected the property on or about March 13, 2023, observed RFCx inventory and operations there, and approved the arrangement. The monthly amount ($2,600) was substantially less than market warehouse rental rates ($3,000-$3,500).  This disclosed and approved arrangement went on for about six months.  Further, because Yassin's vacant home would eventually be sold, a long-term solution was needed.  When

---

[8] *See* **Ex. E**.

[9] *See* **Ex. F** at 1-3.

the potential purchase of property in Oakland, California fell through, Yassin offered to construct a warehouse on his property to store inventory, provide lodging, and serve as an event space, which White also knew about and approved.  Yassin sent photos of the progress to White over time.[10]

### D.    Arbimon: A Transparent Solution to Nonprofit Limitations (2022-2023)

161.    Arbimon was created transparently in 2022 as a practical solution to a common nonprofit problem: RFCx's 501(c)(3) status prevented it from executing certain commercial science contracts that could generate revenue.  White, as a Board member, was fully aware of and participated in creating this structure. Moreover, White was told and understood that Arbimon would be owned by Yassin and three other officers based on their respective contributions.  This arrangement was designed to allow RFCx to capture commercial opportunities while maintaining its nonprofit status—a common and legitimate practice in the nonprofit sector.  Moreover, RFCx's assets were never transferred to Arbimon, nor were they ever intended to.

162.    White himself drafted a "master plan" document showing the proposed ownership structure for a "family of entities" including Arbimon.[11]  Contrary to RFCx's allegations, the "Stakeholders" are plainly "Mahreen, Chrissy, Marconi, and Bourhan" and not White or anyone else.[12] Notably, White surreptitiously incorporated another entity, RFCX, Inc., in Delaware in January 2023, outside of this family structure, in order to transfer RFCx's assets for himself.  Once discovered and confronted, this entity was eventually dissolved.

---

[10] *See, e.g.,* **Ex. F** at 4.

[11] **Exhibit G**, RFCx Master Plan – Family of Entities, drafted by White.

[12]  Although Yassin was listed by White as a stakeholder of Squibbon, this never happened.

17317944

163.    The suggestion that the Board was unaware of Arbimon is demonstrably false—White, a Board member, personally helped design the structure.   Any failure of Board communication was White's responsibility, not Yassin's.   Regardless, White's knowledge as a Board member is legally imputed to the remaining Board members.

### E.    White's Data Destruction and Extortion Attempt (June 2023)

164.    In June 2023, a catastrophic data corruption event occurred that would reveal the depths of White's true ambitions and harm to the organization he founded.  White himself admitted to corrupting RFCx's entire audio database of over 100 million files—the nonprofit's core product.[13]

165.    The data corruption was not "accidental" as White initially claimed but resulted from White's failed attempt to monetize RFCx's data for personal benefit through his company, Squibbon.[14]  White had maintained unauthorized "backdoor" access to RFCx systems that he used to access, create a personal copy on a separate Amazon cloud server account, and ultimately corrupt the data including the document deletion of all AWS log files in an effort to cover his tracks.  RFCx's current CTO, Antony Harfield, was fully aware of White's malicious access and attempted cover-up.

166.    When confronted, White initially lied about his involvement and gave wild and contradictory explanations about backups, including supposedly storing 300 TBs on his girlfriend Sarah Gerber's hard drive. Only when presented with forensic evidence implicating him did White

---

[13] Many (if not all) of the audio files were contributed from multiple academic sources and never conveyed to RFCx, and much of the assets are "open source," making any trade secret assertion particularly specious.

[14] *See* **Exhibit H**, July 14, 2023 Email about commercializing RFCx audio.

17317944

admit his role. On June 24, 2023, White admitted to causing the corruption, but without explaining why he accessed the data in the first place:



167.    White then attempted to hold RFCx's data hostage for several weeks until Yassin pointed out some of the swiped data belonged to the U.S. Fish & Wildlife Service under a federal contract, which caused White to relent and turn over the actual backup to Yassin (after strangely shipping a blank hard drive as a decoy).  Yassin and his team, including Harfield, worked tirelessly to restore the data.[15]

168.    Yassin urged the Board to separate White from RFCx once and for all, leading to negotiations where White demanded a non-disclosure provision to hide his misconduct.  However, the Board's response was tepid at best.  Rather than removing White from the Board or pursuing legal action for the attempted misappropriation and admitted destruction of RFCx's core assets, the Board allowed White to remain in his position.

169.    White then only increased his sabotage, openly criticizing RFCx while promoting Squibbon for his own personal gain.  Once again, Yassin notified the Board, who again did nothing.[16]

F.    **Board Abandonment and Collapse of Governance (2023-2024)**

170.    Throughout 2023 and into May 2024, RFCx's Board utterly failed in its oversight duties: (a) Board members routinely disappeared or were unresponsive for months at a time,

---

[15] *See* **Exhibit I**, Slack messages about data corruption.

[16] *See* **Exhibit J**, March 19, 2024 Email to Board about resignations and impact.

17317944

including during organizational crises; (b) Board member David Klein, fearing personal liability, failed to take corrective action and eventually resigned; (c) the Board ignored desperate pleas from staff about organizational dysfunction; (d) despite White's admitted data destruction and self-dealing, the Board took no action against him; and (e) the Board failed to respond to over 30 employee resignations citing Board failures.[17]

171.    In time, White further interfered with RFCx's operations by improperly trying to take control over bank accounts, change registered agents in California, gain administrative access to various business accounts including DocuSign, and hiring legal counsel.  In some of these instances, White impersonated (or outright stole) Yassin's identity to gain access and control.

172.    Yassin engaged counsel to legally remove White from the Board, revoke his systems access, and separate him from the organization.  Of course, White originally agreed to cooperate, but then reneged in order to play the victim.  And again, the Board failed to act.

173.    By mid-2024, the situation had become untenable.  Over 30 of RFCx's 34 employees had resigned or were planning to resign, explicitly citing Board failures and White's continued interference from his Board position.  Multiple resignation letters documented: (a) the toxic environment created by White and enabled by the Board's inaction; (b) White's continued sabotage of organizational operations; (c) the Board's complete abandonment of its fiduciary duties; and (d) staff members' inability to continue working under such dysfunction.[18]

174.    Specifically, Chrissy Durkin resigned by letter on or about March 12, 2024,[19] noting:

---

[17] *See* **Exhibit K**, April 18, 2024 Email to Board about White's public misconduct.

[18] **Exhibit L**, RFCx Resignation Letters.

[19] *Id.* at 3.

It is important to clarify that my resignation is to disassociate myself from Topher White and the board of Rainforest Connection that has been silent through our most trying times. Throughout my tenure, the Rainforest Connection board has been absent and failed to take necessary action to protect the organization. Topher White has committed a clear pattern of misdeeds that the board continues to turn a blind eye to, and recent events have only further enabled the continuation of self-serving and unethical behavior that has been placated and validated by the board.

I see no viable path forward as this is no longer a safe or healthy working environment. The recent news I received from verified sources that Topher is actively bashing RFCx and recent misrepresentations of RFCx by Topher were the final straw for me. I also learned about Topher's new desire to launch a consumer product through RFCx that he first tried launching under his own private company. Not only does that undermine our scientific credibility but it shows how he continuously undermines our efforts and is operating only for his own personal interests. I believe that for success in our space, leadership needs to be diverse, driven, ethical, and action-oriented, and I believe the current board has proven to be uninterested or unfit.

Less than a week later, RFCx's chief scientist Marconi Campos Cerqueira resigned, along with his entire staff of eight, on or about March 18, 2024,[20] noting:

The ongoing association of our hard work and accomplishments with RFCx board members attempting to leverage organizational successes for personal gain has repeatedly compromised our scientific standing and casts a shadow over our collective efforts. **This situation has trampled the morale of our team and eroded our confidence in the organization's direction**. Additionally, **the gross minimization by the RFCx board of the data corruption incident, and subsequent inaction on an issue which still disrupts our project workflow and severely impacted our mental and emotional well-being, has jeopardized our reputation with partners and the Arbimon community.** This situation has created a deep sense of uncertainty, vulnerability, and abandonment in our team.

175.    Then, on or about March 28, 2024, twenty-four RFCx employees (including two of the four defendants) sent a letter to Yassin demanding "immediate action" against White for his "nefarious actions," including sabotage, self-dealing, and undermining RFCx's "credibility and mission."[21]  Without a response from the Board, employees resigned *en masse*.

176.    As one of the last to resign, Molly Webster's letter dated on or about July 5, 2024, explicitly stated that "the ongoing chaos and our constant efforts to mitigate the negative impacts of the board's decision have taken a toll on my mental health, as I believe it has for the rest of the

---

[20]  *Id.* at 1.

[21]  **Exhibit M**, Letter dated March 28, 2024.

team."[22] Mahreen Qazi also resigned on or about July 5, 2024, stating that "Rainforest Connection no longer represents the values I hold dear."[23]

### G.    White's Campaign of Retaliation and Sabotage (2024)

177.    As it became clear that his misconduct would be exposed, White launched a vindictive campaign to destroy both RFCx and Yassin: (a) making false statements to funders about RFCx's capabilities; (b) sabotaging partner relationships Yassin and others had cultivated for years; (c) spreading false allegations about Yassin to damage his reputation; (d) using his Board position to undermine every attempt at organizational recovery; and (e) eventually orchestrating this lawsuit as a final act of revenge.

178.    The mass exodus of employees to other organizations was not orchestrated by Yassin but was the natural result of staff fleeing White's toxic influence and the Board's complete failure to provide governance.  Even RFCx's partners expressed alarm, with at least one major partner writing to express concern about the "recent changes" after learning of the mass resignations and others threatening to pull funding worth millions.

### H.    Yassin's Constructive Termination and White's Revenge (July 2024)

179.    By late June and early July 2024, White's sabotage campaign had succeeded in making Yassin's departure inevitable. Despite Yassin's efforts to save the organization, the combination of White's active undermining, the Board's complete abandonment of duties, and the mass staff exodus made continued leadership impossible.  For his part, Yassin volunteered to take administrative leave and proposed a separation agreement with 6 months' severance, which was discussed for weeks and eventually approved by at least one Board member.  Yassin began

---

[22] **Ex. L** at 4.

[23] *Id.* at 6.

transferring administrative access to RFCx's CTO as part of a smooth and amicable transition, expecting to leave with a severance.[24]

180.     When Yassin sought to negotiate a professional transition, director David Klein resigned, leaving only White and Board Chari Rob Conant.  White promptly installed his longtime ally, Dr. Krithi Karanth, as a third director without notifying Conant, thereby gaining a voting majority.  With that leverage, White terminated Yassin without cause and withheld his severance. Karanth resigned quietly a few months later and her brief tenure vanished from public records, highlighting the calculated nature of her appointment. RFCx later filed this lawsuit, accusing Yassin of the very misconduct White himself had committed.

181.     On or about February 11, 2025, more than seven months after his termination, White inexplicably appeared without prior notice in person at Yassin's home in Katy, Texas. White was manic, alternating between distraught and intimidating with no clear purpose in mind. Fearing for his family's safety, Yassin convinced White to leave without incident and meet him at a local coffee shop. White never mentioned any complaints or criticism about Yassin (or anyone), focusing instead on a bizarre, high-level discussion about the state of the industry.

182.     This lawsuit represents White's final attempt to rewrite history and destroy the man who exposed his failures and shortcomings.  Every financial transaction Plaintiff purports to challenge was authorized or ratified by White. Every "scheme" Plaintiff alleges was either (i) a legitimate business arrangement White knew about or (ii) a fabrication designed to deflect from White's own misconduct.

183.     The truth is simple: Yassin inherited an organization crippled by its founder's misconduct and incompetence, but worked tirelessly to rebuild it against difficult circumstances.

---

[24] **Exhibit N**, Emails dated July 5, 2024.

White (via RFCx) seeks a scapegoat. This Court should not allow White to weaponize the legal system to complete his destruction of both RFCx and the man who tried to save it.

### **First Cause of Action: Defamation Against RFCx and Topher White**

184.    Yassin re-alleges and incorporates the foregoing paragraphs by reference as if fully set forth herein.

185.    Following Yassin's departure from RFCx, RFCx and Topher White published false and defamatory statements, including but not limited to the statements made in this Complaint itself, about Yassin to third parties, including emails and statements to funders, partners, vendors, the California Attorney General's Office, and even Yassin's current employer, that Yassin "embezzled" over one million dollars from RFCx, "stole" money through various "schemes," destroyed or deleted company data and records, acted to "cripple" and "destroy" RFCx, and engaged in a conspiracy to loot the organization.

186.    These statements were false when made. RFCx and White knew they were false because:

   a.    White himself authorized or ratified the financial transactions now claimed as "embezzlement";

   b.    White admitted to destroying RFCx's data;

   c.    White engaged in his own financial misconduct, including self-dealing;

   d.    White and the Board caused RFCx's collapse through their own misconduct and neglect, as reflected in multiple resignation letters by former RFCx staff; and

   e.    the Board was fully informed of all actions taken by Yassin as CEO.

187.    The statements were published with actual malice. RFCx and White acted with knowledge of falsity and reckless disregard for the truth, seeking to destroy Yassin's reputation to

26

cover his own misconduct. RFCx, controlled by White, republished these falsehoods despite knowing the truth.

188.   These false statements have severely damaged Yassin's personal and professional reputation.  In making such statements, RFCx and White seek to make Yassin unemployable in his field.  The statements have caused Yassin severe emotional distress. The statements constitute defamation per se as they accuse Yassin of crimes involving moral turpitude and conduct incompatible with his profession.

189.   As a direct and proximate result of RFCx's and White's defamation, Yassin has suffered:

      a.      loss of employment opportunities;

      b.      damage to personal and professional reputation;

      c.      emotional distress and mental anguish;

      d.      loss of earning capacity; and

      e.      out-of-pocket expenses defending against false accusations.

190.   Yassin seeks actual damages in an amount to be proven at trial, plus punitive damages given RFCx's and White's malicious conduct.

## Second Counterclaim: Declaratory Judgment

191.   Yassin re-alleges and incorporates the foregoing paragraphs by reference as if fully set forth herein.

192.   An actual, substantial, and justiciable controversy exists between the parties regarding:

      a.      whether the financial transactions at issue were authorized and/or ratified by White and by extension RFCx;

      b.      whether Yassin acted within his authority as CEO;

c.    whether RFCx has legal capacity to bring this suit under California law;

d.    whether restrictive covenants in Yassin's employment agreement are enforceable;

e.    whether RFCx breached Yassin's employment agreement first;

f.    whether RFCx owns any cognizable trade secrets;

g.    whether RFCx's and White's actions and inactions, including destruction of data and self-dealing, bar RFCx's claims.

193.    These controversies are of sufficient immediacy and reality to warrant declaratory relief.

194.    Yassin seeks declarations that:

a.    all financial transactions at issue were expressly authorized by White and/or RFCx;

b.    Yassin acted within his lawful authority as CEO of RFCx;

c.    RFCx lacks legal capacity to maintain this action due to its delinquent nonprofit status under California law;

d.    RFCx materially breached Yassin's employment agreement first, excusing his performance;

e.    RFCx's claims are barred by unclean hands due to White's own misconduct;

f.    Yassin owes no duty to return any funds to RFCx; and

g.    RFCx owes Yassin unpaid compensation, bonuses, and severance.

195.    Such declarations are necessary and appropriate to resolve the parties' disputes and establish their respective rights and obligations.

### Third Counterclaim: Breach of Employment Contract Against RFCx

196.    Yassin re-alleges and incorporates the foregoing paragraphs by reference as if fully set forth herein.

197.    On or about January 26, 2022, Yassin and RFCx entered into a written employment agreement governing Yassin's service as CEO.

28

198.    The employment agreement required RFCx to:

    a.    provide annual salary increases commensurate with Yassin's performance;

    b.    establish a bonus structure within 90 days of employment;

    c.    pay annual bonuses of 20-30% as agreed between Yassin and White;

    d.    conduct regular performance reviews;

    e.    pay six months' severance if Yassin was terminated without cause; and

    f.    provide a professional working environment with proper Board support.[25]

199.    For his part, Yassin fully performed his obligations under the employment agreement, transforming RFCx from the chaos left by White into a professional organization, until RFCx's breaches and White's misconduct made continued performance impossible.

200.    RFCx materially breached the employment agreement by:

    a.    never providing any salary increase despite Yassin's exemplary performance;

    b.    never establishing the required bonus structure;

    c.    never paying any bonus, despite the 20-30% agreement;

    d.    never conducting a performance review; and

    e.    constructively terminating Yassin without cause through:

    f.    the Board's complete abandonment of oversight duties;

    g.    allowing White to sabotage operations from his Board position;

    h.    failing to address White's admitted data destruction;

    i.    creating an impossible working environment; and

    j.    refusing to pay required severance after termination.

    k.    RFCx's breaches were willful and in bad faith, designed to force Yassin out without paying required compensation.

---

[25] *See* **Exhibit Q**, 2022-01 - Offer & Contract - RFCx CEO (Bourhan).

201.    As a direct and proximate result of RFCx's breaches, Yassin has suffered substantial damages including:

      a.    unpaid salary increases from January 2022 through July 2024;

      b.    unpaid bonuses of 20-30% of annual salary for 2022, 2023, and 2024;

      c.    six months' severance pay wrongfully withheld;

      d.    lost benefits and other compensation; and

      e.    damage to career and earning capacity.

202.    Yassin seeks actual damages in an amount to be proven at trial, but no less than $500,000.

### Fourth Counterclaim: Promissory Estoppel Against RFCx/White

203.    Yassin re-alleges and incorporates the foregoing paragraphs by reference as if fully set forth herein.

204.    In December 2021, White promised Yassin on behalf of RFCx that:

      a.    Yassin would be reimbursed for personal expenses incurred supporting RFCx;

      b.    the reimbursements would be handled properly with Board approval;

      c.    White would 'take care of' all necessary approvals; and

      d.    Yassin would be protected if he accepted the CEO role.

205.    White (and RFCx) made these promises to induce Yassin to:

      a.    accept the CEO position after White's forced removal;

      b.    not join the management team's public denunciation of White;

      c.    assist in transitioning White out of the CEO role quietly; and

      d.    take on the enormous challenge of fixing White's destructive tenure.

206.    Yassin reasonably and foreseeably relied on these promises by:

    a.    accepting the CEO position despite knowing the organization's dire state;

    b.    not exposing White's misconduct publicly;

    c.    working to rebuild RFCx despite seemingly impossible circumstances; and

    d.    accepting reimbursements as authorized or ratified by White.

207.    RFCx, through White and later through Board acquiescence, is estopped from denying these promises.

208.    Injustice can only be avoided by enforcing White's promises and barring RFCx's claims.

## JURY DEMAND

209.    Defendant requests a trial by jury on all issues so triable.

## ATTORNEYS' FEES

210.    Pursuant to Texas Civil Practice & Remedies Code Chapter 37 and 38, the employment agreement, and other applicable law, Yassin is entitled to recover his reasonable and necessary attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Defendant/Counter-Plaintiff Bourhan Yassin prays that the Court:

    A.    deny all relief sought in Plaintiff's Complaint;

    B.    dismiss Plaintiff's Complaint with prejudice for lack of capacity to sue;

    C.    enter declaratory judgments as requested above;

    D.    enter judgment in Yassin's favor on all counterclaims and third-party claims;

    E.    award damages for breach of contract and promissory estoppel;

17317944

F.    award actual damages for defamation in an amount to be proven at trial;

G.    award punitive damages for RFCx and White's malicious conduct;

H.    award Yassin his reasonable and necessary attorneys' fees and costs;

I.    award pre- and post-judgment interest at the maximum legal rate; and

J.    grant such other relief as the Court deems just and proper.

Dated: July 24, 2025                                  Respectfully submitted,

                                        By: */s/ Ray T. Torgerson*
                                            Ray T. Torgerson
                                            Attorney-in-Charge
                                            Texas Bar No. 24003067
                                            Lakshmi N. Kumar
                                            Texas Bar No. 24144581
                                            **PORTER HEDGES LLP**
                                            1000 Main St 36th floor,
                                            Houston, Texas 77002
                                            (713) 226-6000 Phone
                                            (713) 228-6000 Fax
                                            rtorgerson@porterhedges.com
                                            lkumar@porterhedges.com

                                            **ATTORNEYS FOR DEFENDANT**
                                            **BOURHAN YASSIN**

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of July 2025, I caused the foregoing to be filed electronically with the Clerk of Court and to be served via the Court's CM/ECF system upon all counsel of record.

                                        By: */s/ Ray T. Torgerson*
                                            Ray T. Torgerson

17317944